TRINA A. HIGGINS, United States Attorney (#7349)
RUTH HACKFORD-PEER, Assistant United States Attorney (#15049)
KEVIN L. SUNDWALL, Assistant United States Attorney (#6341)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah  84111-2176
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No:  1:19-CR-00114 |
| Plaintiff, | : | UNITED STATES SUPPLEMENTAL SENTENCING MEMORANDUM |
| vs. | : | WITH RESPECT TO SENTENCING FACTORS |
| THOMAS FAIRBANKS, | : | |
| Defendant. | : | District Court Judge Jill Parrish |

---

The United States of America, by and through the undersigned Assistant United States Attorney, submits the following as a supplemental sentencing memorandum and position on sentencing factors.

A sentencing hearing on this case was set for May 24, 2023.  The defendant failed to appear at sentencing.  A warrant was issued for his arrest.  During the sentencing hearing the Court shared some thoughts as to three contested sentencing issues.  The issues involve the calculation of the loss amount and the application of two sentencing enhancements, one for abuse of a position of trust, and the other for substantial financial

hardship.  The United States hereby supplements its argument on these three issues. In addition, the United States believes that the two-point enhancement for obstruction of justice is warranted based on Fairbanks' failure to appear at his scheduled sentencing.

### Loss Amount

In calculating the "loss" figure for Sentencing Guidelines purposes the Government contends the appropriate amount is $270,232.[1] This amount is determined taking into consideration United States' Sentencing Guidelines (U.S.S.G.) § 1B1.3 which permits the consideration of other relevant conduct. The applicable subsections of U.S.S.G. § 1B1.3 allow for the consideration of: (1) all the defendant's "acts or omissions committed, … induced, … or willfully caused by the defendant;"; (2) all conduct that was part of "the same course of conduct or common scheme"; and (3) any harm that resulted. U.S.S.G. § 1B1.3(a)(1)-(3). A common scheme or plan occurs when the offenses are substantially connected by at least one common factor – such as common victims, common accomplices, common purposes, or similar modus operandi. Comment 5(B) to U.S.S.G. § 1B1.3(a)(2). Additionally, even when offenses are not part of a common scheme or plan they can qualify as relevant conduct when they are part of the same

---

1   $104,200 of these losses are directly tied to SupplyLine through the parties' contract and the memo line of various checks, which the jury already found constituted securities fraud.

course of conduct. In determining whether the conduct is sufficiently connected, courts look at similarity, regularity, and temporal proximity.

The defendant was convicted of securities fraud in connection with his company SupplyLine. $104,200 are direct Supplyline losses. The rest of the $270,232 in losses arose from the same joint account held by both Mr. Fairbanks and BD (where most of the other SupplyLine loses arose). According to both BD and Mr. Fairbanks, the purpose of this joint account was investments. During the Adult Protective Services Investigation BD indicated she was aware of the joint account with Mr. Fairbanks, indicated that the purpose of the joint account was investments and "reported having contracts and documents in her safe about those matters." Eeb. 2016 Adult Protection Services Report at p. 1, See Supplemental Sentencing Attachment 1. Mr. Fairbanks first claimed there were no written agreements between him and BD but later admitted that he drafted the SupplyLine agreement. Fairbanks' June 5, 2019 Interview with Utah Division of Securities at p. 7 (Hereinafter "Fairbanks Interview at _.), See Supplemental Sentencing Attachment 2. He further admitted that BD's cash investment in SupplyLine went to "businesses that I was …left holding the bag for"[2] and specifically referenced Alpha Graphics and GXN Smithfield. He further disputed that the ERA checks identifying

_____

2       Fairbanks Interview at 10 and 38. First, Mr. Fairbanks acknowledged that SupplyLine money was "input into one of the businesses that I was that I was left holding the bag for." (p. 10) and later acknowledged that "that 40,000 dollars was used to try to help clean up the mess from the Alpha Graphics GXN Smithfield" (p. 38)).

"SupplyLine" in the memo line had anything to do with the investment contract he entered into with BD, but the jury found otherwise. Because Mr. Fairbanks acknowledged that BD's SupplyLine money went to GXN Smithfield and Alpha Graphics, the Court should consider BD's money to those companies as part of the same scheme and course of conduct. Additionally, the Sunny Brae investments were similarly fraudulent because there was no way for these investments to earn a return because, as Fairbanks admitted himself , "Sunny Brae was just a LLC that has been idle that we just used to move money in and out of."[3]

The Defendant was convicted of securities fraud for the investment made with SupplyLine, therefore the common victim factor is met. Additionally, such losses were used for a common purpose. Mr. Fairbanks' own statements – which were admitted at trial as exhibit 13 – support that this money went to prop up business Mr. Fairbanks controlled. This is consistent with the Business Purpose of the SupplyLine Agreement as outlined in Article 1, Section 1.02.4 ("The business of the Collaboration shall be as follows: Capital Creation and Business Enterprise Development – The Bucket"). Therefore, the common purpose factor is also met.

In *United States v. Griffith,* the court addressed relevant conduct in calculating losses under the Guidelines, holding that relevant conduct may be included when

---

3       Fairbanks Interview at p. 26.
4       These documents were admitted at trial as Exhibits 1 and 8.

4

calculating the total amount of loss. *United States v. Griffith*, 584 F.3d 1004, 1018 (10th Cir. 2009). The court reasoned that "In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's 'relevant conduct.'" *Id.* at 1011. In addition, the Court reasoned that "Relevant conduct under the Guidelines thus 'comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct.'" *United States v. Griffith*, 584 F.3d 1004, 1012 (10th Cir. 2009) (quoting *United States v. Allen*, 488 F.3d 1244, 1254-55 (10th Cir.2007)). The court in *Griffith* included the related conduct losses along with the direct loss conceded by the defendant when determining total loss for sentencing purposes, therefore the related conduct losses associated with Mr. Fairbanks scheme should be also included in the loss calculation.

Accordingly, the checks and transfers to Mr. Fairbanks' Cache Valley Management account for $121,510, to Mr. Fairbanks' GXN Smithfield account for $32,022, and to Mr. Fairbanks' Sunny Brae account for $12,500, should be included in the calculation of the total loss for sentencing purposes pursuant to U.S.S.G. § 1B1.3 as related conduct.

The total of funds from BD and RH to Mr. Fairbanks' controlled businesses thus equal $270,232, and because they are derived under the same joint bank account, during the same relevant time period, and Mr. Fairbanks acknowledged that BD's SupplyLine

money went to these particular failing businesses, the entire $270,232 should be considered loss for sentencing purposes.

### Abuse of a Position of Trust

The United States also seeks a two-level enhancement pursuant to U.S.S.G. § 3B1.3 for "abuse of position of trust". This adjustment should apply because Fairbanks held a position of private trust vis-a-vis B.D. as her fiduciary and facilitated his offense by this position.

The enhancement applies when "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" USSG § 3B1.3 Application Note 1. The Guideline comments to § 3B1.3 defines "public or private trust" as "a position . . . characterized by professional or managerial discretion." USSG § 3B1.3, comment. (n.1). "The question of whether an individual occupied a position of trust is evaluated from the victim's perspective." *U.S. v. Trammell*, 133 F.3d 1343, 1344 (10th Cir. 1998) (quoting *U.S. v. Queen*, 4 F.3d 925, 929 n. 3 (10th Cir. 1993)).  Additionally, "[t]he existence of a fiduciary or personal trust relationship sometimes justifies imposition of a § 3B1.3 enhancement." *U.S. v. Trammell*, 133 F.3d 1343, 1355 (10th Cir. 1998). That position of trust need not be a formal one; instead, the enhancement applies if the victim trusts the defendant because the defendant "create[s] sufficient indicia that he occupies such a

position of trust that he should be held accountable as if he did occupy such a position."
*U.S. v. Queen*, 4 F.3d at 929 n. 3.

Courts have applied this adjustment to both formal and informal caregivers. *U.S. v. Weiss*, 2002 WL 1489415 (7th Circuit July 10, 2002) (applying the position of trust enhancement to a fiduciary who stole his elderly second cousin's savings bonds by access to her safe deposit box); *U.S. v. Morris*, 350 F.3d 32 (2d Cir. 2003) (applying position of trust enhancement to home health aid who had relatively unsupervised discretion over victims' daily care and whom victims relied upon for daily needs); *U.S. v. Haines*, 32 F.3d 290 (2d Cir. 1994) (applying enhancement to a caregiver who secured power of attorney and used that power of attorney to enrich herself).

The Tenth Circuit has also upheld the enhancement in cases of spiritual leadership. *U.S. v. Chee*, 514 F.3d 1106 (10th Cir. 2008) (applying position of trust enhancement to a tribal medicine man who was trusted by the family and others to perform certain duties to help a special needs daughter and was allowed to enter the home unsupervised because "everyone trusted him").

Here, Mr. Fairbanks' actions toward B.D. as her caregiver and fiduciary, including as a signatory on her bank account and as her personal investor, achieved a position of trust and gave him the position of control that justifies the two-level enhancement. B.D. had high physical needs: she was elderly, susceptible to strokes, and medically vulnerable. Mr. Fairbank's daily visits and special attention allowed B.D. to put all her

faith in him, a position defense acknowledges in their sentencing memo: "BD considered Mr. Fairbanks to be her closest friend and greatly valued his attention, conversation, and help with her home and business." Docket No. 149, Defense sentencing memo, p. 5. Others also noticed their trusting relationship, including BD's friends' letters to the court that "show that BD had complete trust in Mr. Fairbanks and considered him as her closest friend." *Id.* At 7. Kathleen Burnett wrote that "[B.D.] told me many times that he (Mr. Fairbanks) was like the 'son' she never had." Docket Number 149-1 p. 5.

In addition, Mr. Fairbanks held himself out as a successful businessman who could help BD with her check writing and her investing. He had the imprimatur of his church thanks to his role as a Stake Finance Clerk, which gave him managerial supervision over the assets of multiple congregation members. Mr. Fairbanks leveraged this position to bolster his claims as a successful businessman who managed money well, portraying himself as a trusted religious authority who was qualified to assist with B.D.'s finances because he was trusted by his church leadership to assist with church finances. Her sheer losses show that B.D. believed him.

After he obtained B.D.'s trust, he also obtained B.D.'s financial information to ostensibly assist her with her financial affairs and help her write checks. He then became a joint signatory on her bank accounts with unrestricted access to her entire financial life, including her personal assets, her herbal shop, and her family affairs. Using this informal,

but nonetheless powerful, role, Fairbanks diverted her money to himself, able to conceal his offenses because of his access and control of her money.

We know now that these investments were fraudulent, and that Mr. Fairbanks used his power over B.D. to sell an unregistered, unlicensed security to BD and another victim. The Jury found Mr. Fairbanks guilty of securities fraud, and that fraud occurred because of what the defense calls BD's "complete trust" in Mr. Fairbanks. Defense sentencing memo at 7. That kind of trust—the best friend and "son" he was to her, and his use of that trust to hide his offenses, justifies the two-level enhancement for abuse of a position of trust.

Fairbanks' control was so complete that B.D. never realized the extent of his power over her money. When the Utah Adult Protective Services investigated allegations of elder fraud and abuse, they closed three separate cases as "inconclusive" because B.D. insisted her investments were safe. In the first investigation starting February 2016, B.D. confirmed that she knew Mr. Fairbanks was accessing her money, but because she "trust[ed] Thomas [Mr. Fairbanks] to invest her money the way he has done so," she denied any abuse or fraud. In December 2016, during the second investigation, the investigator concluded that BD "made informed decisions to trust Thomas to invest up to a quarter million dollars of her money" in real estate (We are not asking the Court to consider the real estate losses part of the fraud loss amount). Mr. Fairbanks was interviewed and agreed that the "investments are legitimate and in real estate." She

trusted Mr. Fairbanks so much that she never looked deeper than his word as to where her investments were going. Even after all her money was taken and spent by Fairbanks, B.D. trusted him until the day she died, insisting that her money was not in the bank account because Fairbanks had safely invested it. While the defendant knowing he had spent it all, told Investigator Blaylock, that it was all gone, and yet he would somehow find a way to pay her back.

### Substantial Financial Hardship

The United States asserts that the two-level enhancement under U.S.S.G. § 2B1.1(2)(A), substantial financial hardship to one or more victims applies in this case.  In determining whether substantial financial hardship to a victim occurred, the court shall consider, among other factors, "whether the offense resulted in the victim becoming insolvent, filing for bankruptcy, suffering substantial loss of a retirement, education, or other savings or investment fund, making substantial changes to employment, making substantial changes to living arrangements, or suffering harm in ability to obtain credit."

At trial RH testified to her inability to have dental surgery when she needed it. She testified that she told the defendant when she invested with him that she would need the money back before the stated term in the contract. She in fact, did ask for the investment money back in order to get and pay for her needed surgery and had to postpone her surgery because of the defendant's fraud. She also testified that she asked for the money back and Mr. Fairbanks evaded her for more than 3 months. While she did

not specifically testify at trial that she had to delay her dental surgery, she did discuss that with Ms. Blaylock in an interview. RH suffered from not having the defrauded funds at the time they were needed to get her medical surgery.  She had to delay her medical surgery because she did not have the money that Mr. Fairbanks had defrauded her of.

Similarly, in *US v. Brandriet*, 840 F.3d 558 (8th Cir 2016), the Eighth Circuit explained that the defendant stole money that was earmarked for living expenses and because living expenses such as rent are time sensitive, that withholding the check for four months resulted in substantial financial hardship.  Similarly, this dental surgery was time sensitive and RH was unable to have the surgery when she needed it because of Mr. Fairbanks fraud. *See also U.S. v. Castaneda-Pozo*, 877 F.3d 1249 (11th Cir. 2017) (enhancement applied when victim was made insecure in life's basic necessities),

In addition, the sheer amount of loss for BD, who was elderly and had medical needs herself, justifies the enhancement here. Mr. Fairbanks obtained more than $625,000 from BD, $265,000 of which was directly tied to Supplyline and Mr. Fairbanks' companies where SupplyLine money went.  This amount of fraud certainly impacted what money was available for her to go into assisted living, for her to enjoy retirement, take a vacation or pass on to her favored charities or estate at her death.  *See United States v. Poulson*, 871 F.3d 261 (3rd Cir. 2017)(enhancement applied when victims lost a portion of their retirement funds or faced significant lifestyle changes); *see*

*also U.S. v. George*, 949 F.3d 1181 (9th Cir. 2020)(significant financial losses for purpose of enhancement must be gauged relative to each victim);

### Enhancement for Obstruction of Justice.

Finally, the United States now also seeks the two-level enhancement under USSG § 3C1.1 for obstruction of justice. This adjustment applies because Mr. Fairbanks willfully obstructed justice by absconding instead of attending his sentencing. The guideline applies if a defendant (1) "willingly obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." USSG § 3C1.1 This includes "willfully failing to appear, as ordered, for a judicial proceeding." *Id.* Application Note 4(E).

The Tenth Circuit has upheld this enhancement in cases where a defendant did not appear for his sentencing hearing. *United States v. Salazar*, 446 F.App'x 110, 112 (10th Cir. 2011) (unpublished) (upholding the enhancement when defendant missed his scheduled sentencing hearing, "bring[ing] his conduct within a straightforward reading of comment 4(E) of USSG § 3C1.1"); *see also United States v. Williams*, 374 F.3d 941 (10th Cir. 2004). There is also no state of mind requirement required—"intentional flight from judicial proceedings is sufficient to support imposing an obstruction enhancement pursuant to § 3C1.1" *United States v. Keats*, 937 F.2d 58 (2d Cir. 1991).

Here, Fairbanks failed to appear for his sentencing hearing despite his requirement to attend, thus obstructing justice. Local and federal law enforcement officers have gone to his home and his work and continue to attempt to find and apprehend him but despite expending time, energy, and taxpayer dollars, to date, he has not been located.

All that is required for the enhancement is for him to intentionally not appear. Because he made no indication that he was prevented from attending, because he filed a bizarre motion to the Court protesting the Court's jurisdiction to enter the sentence the night before the scheduled sentencing hearing, and because he did not respond to his attorney's communications during the hearing, there is a preponderance of evidence that his absence was intentional. The two-level enhancement for failing to appear is warranted.

/

/

/

/

/

/

/

13

**Conclusion**

The United States respectfully requests the Court adopt the $270,232 loss amount figure, apply the position of trust enhancement, the significant financial hardship enhancement, and the obstruction of justice enhancement. With these adjustments, the United States believes the Defendant's appropriate offense level is 26, and the sentencing guideline range should be 63-78 months. Finally, the United States sees no compelling reasons to depart from this range.

RESPECTFULLY submitted.

TRINA A. HIGGINS
United States Attorney

RUTH HACKFORD-PEER
Assistant United States Attorney

14